AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**JUN 10 2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ rsm ___ DEPUTY

United States of America

v.

HARMI HENARE DAVIS and
SALEEM JALLOH,

　　　　　Defendant.

Case No. **2:24-MJ-03384-DUTY**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 7, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

　　　*Please see attached affidavit.*

　　☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Jason A. Willock, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___June 9, 2024___

*Judge's signature*

City and state: ___Los Angeles, California___

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kenneth R. Carbajal x3172

**AFFIDAVIT**

I, Jason A. Willock, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Harmi Henare DAVIS ("DAVIS") and Saleem JALLOH ("JALLOH") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of an application for a warrant to search two digital devices (collectively the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration, in Los Angeles, California, as described more fully in Attachment A, namely:

a.   a silver/white Apple iPhone with a red, orange and yellow wallpaper on the lock screen seized from DAVIS on June 7, 2024 ("SUBJECT DEVICE 1"); and

b.   a black Samsung mobile phone with a rainbow color wallpaper lock screen and a "ethika" decal sticker on the back of the device seized from inside the Burbank Residence (defined below) on June 7, 2024 ("SUBJECT DEVICE 2").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.   I am an investigative and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is empowered to conduct investigations of, and to make arrests for, the drug trafficking offenses enumerated in 18 U.S.C. § 2516.

6.   I am a Special Agent with the Drug Enforcement Administration ("DEA"), and I have served as a Special Agent since February 2009.  To become a Special Agent, I completed a 19-week course in Quantico, Virginia, which involved specialized trainings on topics including, but not limited to, drug interdiction, money laundering techniques and schemes, smuggling, financial investigations, controlled substance identification, physical and electronic surveillance, confidential source management, undercover operations, and the investigation of individuals and organizations involved in the

smuggling, cultivation, manufacturing, and trafficking of controlled substances.

7.   I am currently assigned to the DEA's High Intensity Drug Trafficking Area ("HIDTA") division in Los Angeles, California.  Additionally, I am a member of the HIDTA Task Force Group 46, which is tasked with investigating large-scale drug trafficking organizations operating in the greater Los Angeles, California area.

8.   Prior to my employment with the DEA, I was employed at the District of Columbia Office of the Mayor as a project manager for 2 years.  My work in drug investigations has included conducting and participating in physical surveillance, drafting and executing search warrants, and conducting arrests. As a Special Agent, I have interviewed drug users, buyers, sellers, manufacturers, transporters, and informants, and I have discussed with them various methods they use to safeguard their drug stashes and illicit proceeds and to avoid law enforcement detection.  Based on my knowledge, training, experience, and conversations with other experienced law enforcement officers, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of monetary proceeds of drug trafficking.  I am also familiar with how digital devices are used to facilitate and conceal these crimes.  My experience as a Special Agent have allowed me to develop a broad understanding of drug crimes, drug offenders, and the daily operations and common practices of drug trafficking organizations.

9.    I have participated in numerous drug trafficking investigations, and I have also spoken with defendants as well as confidential informants regarding the possession, sale and distribution of illegal substances.  In conducting these drug trafficking investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, and various types of informants and cooperating sources.  Through the abovementioned investigations, my training and experience, and conversations with other experienced agents and law enforcement personnel, I have become familiar with the methods used by drug traffickers to smuggle and safeguard drugs, distribute drugs, and to collect and launder illicit drug-related proceeds.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

10.   On May 24, 2024, officers of the Alhambra Police Department ("PD") arrested Andre Adrian McKenzie ("McKenzie") and Jafar Sadiq El-Emmara ("El-Emmara") for a violation of California Health and Safety Code § 11352: to sell, furnish, administer, give away or transport controlled substances.

11.   On May 24, 2024, in the early afternoon, the owner of a single-family home located in Alhambra, California (the "Alhambra Residence"), that is available to rent on the Airbnb website called the Alhambra PD to report that numerous cardboard boxes containing what appeared to be drugs were found in the Alhambra Residence.  Shortly afterward, when two uniformed Alhambra PD officers arrived at the Alhambra Residence, the officers observed approximately 25 boxes containing

methamphetamine wrapped in plastic.  Later that afternoon, Alhambra PD officers arrested El-Emmara and McKenzie in connection with the boxes of methamphetamine.

12.  A review of El-Emmara's telephone uncovered detailed notes about the use of Airbnbs, obtaining the supplies to ship the boxes out of California, and receipts for the cost of boxes, packing peanuts, and other shipping items.

13.  On May 26, 2024, the Honorable Margo A. Rocconi, United States Magistrate Judge for the Central District of California ("CDCA"), issued complaint 2:24-mj-03086-DUTY charging both El-Emmara and McKenzie with 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance and search warrant 2:24-MJ-03102-DUTY for El-Emmara & McKenzie's phones.

14.  Based upon a review of Airbnb records, law enforcement were alerted to a specific address on S. Lake St., Burbank, California 91502 (the "Burbank Residence"), that is believed to be connected to the same drug trafficking organization and that is using the same tactics, packaging materials, and methods used by El-Emmara and McKenzie prior to their arrest.

15.  On June 7, 2024, law enforcement officers observed JALLOH and DAVIS taking cardboard boxes and packaging materials into the Burbank Residence. Law enforcement officers later recovered approximately 467 pounds of suspected methamphetamine from a black BMW leaving the Burbank Residence, which DAVIS was driving immediately prior to being detained by police officers. JALLOH exited the Burbank Residence and walked in the direction

5

of where officers encountered DAVIS on Lake Street and Allen Avenue when he was detained by law enforcement. JALLOH was approximately 80 meters (2 houses in distance away) from the Black BMW at the time of his encounter with police.

16. On June 7, 2024, the Honorable Karen L. Stevenson, United States Magistrate Judge for CDCA, issued a warrant to search the Burbank Residence. DEA Agents executed the search warrant and observed several suitcases, backpacks, and other types of bags, various packaging/shipping materials, digital scale for weighing items, and an array of personal items inside of the Burbank Residence.

## IV. **STATEMENT OF PROBABLE CAUSE**

17. Based on my conversations with various law local police officers, other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

18. The Alhambra Residence is a two-bedroom, one-bathroom, single-family home available for rent on the Airbnb website.[1] Through Airbnb, a person named Juan Jaramillo ("Jaramillo") booked the Alhambra Residence from May 22, 2024, until May 24, 2024.  Check-out from the Alhambra Residence was at 11:00 a.m.[2]

19. On May 24, 2024, at 1:00 p.m., Alhambra PD Officer Rocio Garcia and Alhambra PD Corporal Eric Ybarra arrived at the

---

[1] Airbnb is an online platform where people can list or rent properties for short-term use.  Once a guest has found a suitable property, they can send the "host" an inquiry (unless Instant Book is enabled) with questions about the property or expressing an interest to rent the property.  The host has 24 hours to accept or reject booking requests.

[2] All times are approximate unless notated otherwise.

Alhambra Residence in response to a call from the owner of the residence, who is also the Airbnb host.  When the officers arrived, the owner, the person who cleans the rental and one other individual were waiting for them at the Alhambra Residence.

20.  According to the owner, Jaramillo attempted to extend the Airbnb booking by one extra day, until May 25, 2024.  The owner denied the request to extend because the residence was already booked by new renters.  The owner explained, earlier that morning, shortly after the 11:00 a.m. check-out time, the person who was cleaning the residence found numerous unopened cardboard boxes inside the residence.  According to the owner, the cleaner called and asked for instructions.  The owner told the cleaner that the boxes were abandoned and instructed the cleaner to open the boxes.  What appeared to be drugs were found inside the boxes.

21.  Officer Garcia and Corporal Ybarra observed that the approximately twenty-five cardboard boxes were moved outside and placed in the front portion of the residence.  Inside the cardboard boxes, Officer Garcia and Corporal Ybarra observed a clear crystalline substance that appeared, in their training and experience, to be methamphetamine wrapped in clear plastic. There is a doorbell security camera located in the front of the Alhambra Residence.  The owner showed Officer Garcia and Corporal Ybarra a video recording, dated May 22, 2024.  At approximately 6:44 p.m., the video showed a U-Haul van back into the driveway of the Alhambra Residence.  The video then showed

7

two men, later positively identified as McKenzie and El-Emmara, moving cardboard boxes from the U-Haul into the residence.

22.   Alhambra PD personnel loaded the boxes of methamphetamine into a police vehicle for transport to the Alhambra Police Station.  As the task of loading the methamphetamine into the police vehicle was completed, Corporal Ybarra observed a similar looking U-Haul van drive into the middle of the street in front of the residence and stop.  The U-Haul van then conducted a three-point turn and drove away from the residence.  The occupants of the U-Haul van looked similar to the men in the video.

23.   Other members of Alhambra PD conducted a traffic stop of the U-Haul van.  Through still frames of the video, the two occupants of the U-Haul van were identified as McKenzie and El-Emmara.  El-Emmara was the driver of the U-Haul and McKenzie was the front passenger.  They were arrested for a violation of California Health and Safety Code § 11352 (selling, furnishing, administering, giving away or transporting controlled substances).  Upon arrest, an Apple iPhone in a red cellphone case was seized from McKenzie and a blue Apple iPhone 13 Pro was seized from El-Emmara.  McKenzie and El-Emmara were transported to the Alhambra Police Station for booking and processing.

24.   At the Alhambra Police Station officers determined the methamphetamine weighs approximately 235 lbs.  DEA lab testing later confirmed the amount was approximately 97 kilograms (213 pounds) of pure methamphetamine.

25.  Also, at the Alhambra Police Station, I observed as SA
Erwin Benedicto read El-Emmara his Miranda Warnings from a DEA-
13 form.  El-Emmara elected to waive his rights and provided
statements.  El-Emmara claimed that he received instructions
from certain individuals based in the United Kingdom via text
messages and cell phone calls.  Originally, El-Emmara said he
was only scheduled to stay in the United States until shortly
after his birthday earlier that month.  However, El-Emmara
explained that the individuals from the United Kingdom promised
to pay for his trip and provide an additional £10,000 to £15,000
(British pound sterling, not dollars) if he performed certain
errands.  El-Emmara added that moving the boxes was part of the
errands.  El-Emmara said that he believes the boxes are supposed
to be delivered to a co-conspirator's contact in New York.  When
asked if he knew what was inside the boxes, El-Emmara said
marijuana, cocaine or an illegal drug.

26.  McKenzie is a citizen of the United Kingdom.  El-
Emmara is a citizen of Sweden.

### A.  Investigation Following Recovery of Methamphetamine from the Alhambra Residence

27.  On May 28, 2024, SA Logan Bonifas conducted a review
of a telephone belonging to El-Emmara that was found in the U-
Haul van on May 24, 2024.  SA Bonifas observed detailed notes,
dated May 22, 2024 at 10:21 a.m., with the following:

"75 BOXES

74 boxes full 4 products

1 box 3 full products

= 299 full products

(0.914 is placed in one of the boxes I don't remember exactly which box)"

28.    Immediately below that, SA Bonifas observed the address of the Alhambra Residence where Alhambra PD officers had seized 25 boxes containing methamphetamine.  The notes found within the telephone were labeled A through Y with various weights in pounds, believed to be the weight of the methamphetamine containers.  During the seizure of the 25 boxes at the Alhambra Residence, law enforcement observed letters A through Y on the boxes that contained methamphetamine.  Based on my knowledge, training, and experience, I believe the notes contained within the telephone correspond to the methamphetamine that was seized by Alhambra PD.

29.    SA Bonifas observed the similar format for a specific address on Midwickhill Drive in Alhambra, California (the Midwickhill Drive Location"), separate from the Alhambra Residence, for "25 BOXES BELOW" that indicated boxes A1 through Y1 with various weights in pounds, believed to be the weight of the suspected methamphetamine in pounds.

30.  SA Bonifas observed the same similar format for another address located on Bartlett Avenue in Rosemead, California (the "Bartlett Avenue Location"); however, these notes found within the telephone were labeled A2 through X2 and Z through Z1.  As depicted in the photograph, SA Bonifas observed various weights in pounds, believed to be the weight of the suspected methamphetamine in pounds.  SA Bonifas observed notes found within the telephone that had three addresses in New York and the three addresses, namely the Alhambra Residence, the Midwickhill Drive Location, and the Bartlett Avenue Location.



31.  Law enforcement knocked on the door at the Midwickhill Drive Location and the Bartlett Avenue Location, but

the Airbnb tenants had already left the respective residences. Based on my knowledge, training, and experience, I believe the other co-conspirators were alerted of McKenzie and El-Emmara arrest and may have relocated the remaining suspected methamphetamine to avoid law enforcement detection.

32.  During an interview on May 24, 2024, El-Emmara told law enforcement officers that his vehicle was parked at a specific location on Arcadia Street, Arcadia, California (the "Arcadia Street Location").  Law enforcement officers knocked on the door at the Arcadia Street Location, nobody answered the door; however, a trash pull from the community dumpster revealed multiple flattened boxes, packaging peanuts, metal sheets, gloves, and masks.  The flattened boxes were not plain but had identified markings written on them with black marker as these boxes were marked with letters and numbers, for example, "C2" as depicted below.  This box, found in the community dumpster at 827 Arcadia Street, was marked "C2" and matched the weight "6.8 kg" that was noted in El-Emmara's seized telephone (photograph of the Bartlett Avenue Location and boxes with weights).



33.   Based on the detailed notes from El-Emmara's seized
telephone, I believe this box marked C2 may have been at the
Bartlett Avenue Location and moved to the Arcadia Street
Location once law enforcement arrested McKenzie and El-Emmara.

34.   Below the addresses within El-Emmara's telephone, SA
Bonifas observed three telephone numbers that state, "ALL 3
ACTIVE NUMBERS:(NO NAMES)".  Based on my knowledge, training,
and experience, I know drug traffickers typically use new
telephone numbers that are activated with no names to thwart law
enforcement and avoid detection.

### V.  <u>INVESTIGATION OF THE BURBANK RESIDENCE</u>

35.  On June 6, 2024, I received records from Airbnb regarding the address of the Alhambra Residence and Jaramillo. I saw that Juan Cifuentes Jaramillo, believed to be Jaramillo under Airbnb User ID 201246472, booked all three California addresses – the Alhambra Residence, the Midwickhill Drive Location, and the Bartlett Avenue Location. In addition, I saw, on May 25, 2024, at 6:39:50 p.m., Juan Cifuentes, believed to be Jaramillo under Airbnb User ID 579604371, created an account, the day after McKenzie and El-Emmara were arrested.  Airbnb provided records of another individual, Stephanie Matias (Airbnb User ID 511593414) ("Matias"), because the Matias account shared an Internet Protocol ("IP") address with Jaramillo's account. From the reviewed records, I learned the following:

a.  IP address 90.210.213.233 is shared among Matias and Jaramillo's Airbnb User ID 579604371 account.

b.  Matias, under Airbnb User ID 511593414, booked the Burbank Residence on June 4, 2024, for a total of fourteen nights, with the reservation beginning on June 4, 2024.

36.  On June 7, 2024, at 8:00 a.m., Alhambra PD Detective Joseph Wilson conducted surveillance of the Burbank Residence. At 8:30 a.m., Detective Wilson observed DAVIS, wearing a red shirt, exit the front door of the residence and approach a black BMW with California license plate ****563 ("black BMW ****563") which was parked in the driveway of the Burbank Residence. DAVIS opened the passenger rear door.  DAVIS removed two red canvas bags out of the back seat that appeared to be weighted

and walked into the house. Detective Wilson noted that DAVIS made four trips from the vehicle to the house with the red bags. DAVIS then opened the trunk of the black BMW ****563 and removed brown boxes which were similar in size as the ones seized at the Alhambra Residence. The boxes were flat and not formed into a cube yet. After making several trips, DAVIS went inside the Burbank Residence where DAVIS stayed for several hours.

37.   At 12:30 p.m., DAVIS and JALLAH exited the Burbank Residence and entered into the black BMW ****563. DAVIS and JALLOH went to a local restaurant where they stayed inside for approximately forty-five minutes and returned back to the Burbank Residence.

38.   At approximately 1:30 p.m., DAVIS and JALLOH exited the Burbank Residence and went to a Staples store. Det. Edwin Dumaguindin from Pasadena PD conducted foot surveillance and observed them purchasing packaging peanuts, which were similar to what was seized at the Alhambra Residence.

## VI. STOP OF THE BLACK BMW, CANINE POSITIVE ALERT AND VEHICLE SEARCH

39.   On June 7, 2024, at approximately 7:35 p.m., Alhambra PD Det. Wilson observed an individual, later positively identified as JALLOH (when JALLOH was arrested later that evening), walk out of the Burbank Residence and over to the black BMW ****563.  Det. Wilson observed JALLOH unlock the black BMW ****563, open the doors and trunk, then walk back into the Burbank Residence.  Next, Det. Wilson observed an individual, later positively identified as DAVIS (when DAVIS was arrested

15

later that evening), walk out of the Burbank Residence carrying brown cardboard boxes.  DAVIS took the boxes to the black BMW ****563 then walked back to the residence.  Det. Wilson observed DAVIS repeatedly carry boxes from the Burbank Residence to the black BMW ****563.  Det. Wilson estimated that DAVIS placed over thirty boxes into the black BMW ****563.

40.  After the black BMW ****563 was loaded full of cardboard boxes, Det. Wilson observed DAVIS get into the driver's seat, close the door and reverse the vehicle out of the driveway of the Burbank Residence.  DAVIS drove the black BMW ****563 southbound and turned left (southeast) onto Allen Ave. By this time, Det. Wilson and other members of Alhambra PD and Pasadena PD, in their unmarked police vehicles with lights and sirens activated, stopped the black BMW ****563.

41.  At approximately 7:50 p.m., Det. Wilson observed that the black BMW ****563 pulled over to the south curb of Allen Ave. in front of a residence.  DAVIS was detained without incident.  Shortly after DAVIS was detained, SA Erwin Benedicto observed Pasadena Police Officer Robert Christian and his narcotics canine "Chase" walking around the black BMW ****563. Officer Christian confirmed that Chase positively alerted to presence of narcotics in the black BMW ****563.

42.  As DAVIS was being detained on Lake Street and Allen Avenue, I (along with SA Nick DeSimone, members of Alhambra PD and members of Pasadena PD) detained JALLOH, who had stepped outside the Burbank Residence and was walking in the direction of where officers encountered DAVIS.  Law enforcement personnel

entered the Burbank Residence, not to search, but to conduct a protective sweep to ensure that there were no additional persons inside.  No other individuals were located inside.

43.  Upon apprehending DAVIS, Pasadena PD officers recovered SUBJECT DEVICE 1 from DAVIS's person.

44.  At approximately 8:00 p.m., SA Benedicto, Alhambra PD Det. Corey Fukumoto and Task Force Officer (TFO) Juan Santana searched the black BMW ****563.  SA Benedicto counted approximately forty cardboard boxes.  Inside each cardboard box, SA Benedicto observed approximately five bundles inside each box with white foam packing peanuts.  Each bundle consisted of bubble wrap, wrapped around a vacuum seal, wrapped around a Ziploc bag, containing a white crystalline substance that SA Benedicto recognized, through his training and experience, as crystal methamphetamine.  SA Benedicto later weighed the suspected methamphetamine, totaling approximately 467 pounds.

45.  At approximately 11:30 p.m., I along with SA Benedicto, SA DeSimone, SA Greg Airdo, and TFO Santana executed a search warrant issued by the Honorable Karen L. Stevenson, United States Magistrate Judge for CDCA, at the Burbank Residence.  Agents observed at least four rolls of packing tape, handheld packing tape dispensers, bubble wrap, Large black color Sharpie markers, scissors, approximately 15 large Target store vinyl shopping bags[3], a medium-sized silver digital scale for

---

[3] On June 7, 2024, I reviewed a video taken by Det. Wilson during that same day, which showed DAVIS carrying red Target Store bags that matched the appearance of the bags retrieved by agents inside the Burbank Residence.

weighing items, multiple empty large suitcases with scattered
packing peanuts in and around their location and other travel
style bags containing personal items and clothes belonging to
DAVIS and JALLOH. I recovered DAVIS's Australian passport from a
black Dickie's brand backpack in the living and JALLOH's
Australian passport from a black Kappa brand backpack also in
the living room.

46.   SA Benedicto recovered SUBJECT DEVICE 2 from inside
the front bedroom of the Burbank Residence.

47.   Additionally, TFO Santana and I observed a large roll
of plastic bubble wrap in the outside trash bins of the
residence that was consistent with the style of bubble wrap used
to cover the seized methamphetamine from the black BMW.

### VII. TRAINING AND EXPERIENCE ON DRUG OFFENSES

48.   Based on my training and experience, including my
familiarity with investigations into drug trafficking conducted
by other law enforcement agents, I know the following:

   a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds. Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

   b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the

manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices, and in their homes, cars, garages, and storage units.

       c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones or other digital devices, of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.   Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

       e.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

       f.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence

or in safes.  They also often keep other items related to their drug trafficking activities at their residence, garage, car, and storage units, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

    g.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, and at their homes, cars, garages, and storage units.

    27.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>CONCLUSION</u>

31.  For all of the reasons described above, there is probable cause to believe that DAVIS and JALLOH have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  In addition, for all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 9th day of June,
2024.

_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE